In re Yasuhiko TOMINAGA, Debtor.

Yasuhiko Tominaga, Plaintiff,

v.

Sherwood Investments [Overseas] Limited, Julian M. Benscher, George Roat, Greenspoon Marder Hirschfeld Rafkin & Berger, P.A., Defendants.

Bankruptcy No. 6:04–BK–08527–KSJ.
Adversary No. 6:04–AP–224.

United States Bankruptcy Court,
M.D. Florida,
Orlando Division.

March 31, 2005.

Yasuhiko Tominaga, Windermere, FL, pro se.

Adam L. Alpert, Bush Ross, P.A., Tampa, FL, for Plaintiff.

*FINDINGS OF FACT AND CONCLU-SIONS OF LAW DENYING DEBT-OR'S AMENDED EMERGENCY MOTION FOR TURNOVER*

KAREN S. JENNEMANN, Bankruptcy Judge.

This case and the related Adversary Proceeding No. 04–224 came on for an evidentiary hearing on November 22, 23, and December 6, 2004. At the conclusion of the evidentiary proceeding, the Court made certain preliminary findings of fact and conclusions of law, pursuant to Bankruptcy Rule 7052, and took under advisement the Amended Emergency Motion for Turnover of Property of the Estate and Request for Clarification Regarding Order Granting Motion for Relief from Stay Filed by Sherwood and Deferring Ruling on Motion for Turnover and Request for Emergency Hearing (the "Emergency Motion") (Main Case Doc. No. 70) filed by the debtor, Yasuhiko Tominaga. The Court

also took under advisement Count V of the related adversary proceeding, which seeks similar relief under 11 U.S.C. Sections 542 and 550 of the Bankruptcy Code [1] against the defendants, Sherwood Investments [Overseas], Ltd. ("Sherwood"), Julian M. Benscher, George Roat, and Greenspoon Marder Hirschfeld Rafkin & Berger, PA.[2] These written findings of fact and conclusions of law supplement the earlier oral findings and conclusions.

In both the Emergency Motion and in Count V of the adversary proceeding, Tominaga asks this Court to require Sherwood and Benscher to return to him certain stock certificates they have in their possession. The stock certificates relate to three companies previously operated by Tominaga. What the debtor really seeks, however, is the right to resume authority over the corporations' operations. For the reasons stated orally and in this written opinion, the Court holds that, at this time, Tominaga is not entitled to the turnover of the stock or to resume control of the corporate operations.

Since 1990, Mr. Tominaga and his late wife, Yoko Tominaga, have owned 100% of the stock of Japan Pacific Trading Corporation, a California corporation ("Japan Pacific") and American Mercantile Corporation, a Florida corporation ("AMC"). In turn, Japan Pacific is a holding company that owns 100% of the stock of Florida Select Citrus, Inc., a Florida corporation ("Florida Select"). Japan Pacific, Florida Select, and AMC collectively are referred to as the "Corporate Entities."

Florida Select operates a juice packaging plant which occupies approximately 40

---

1. Unless otherwise stated, all references to the Bankruptcy Code refer to Title 11 of the United States Code.

2. The debtor later voluntarily dismissed the following two defendants: Greenspoon Mard-

er Hirschfeld Rafkin & Berger, P.A. (Doc. No. 40) and George Roat (Doc. No. 41). The only remaining defendants are Sherwood Investments [Overseas], Ltd. and Julian M. Benscher.

acres of potentially valuable land near Groveland, Florida. AMC conducts an orchid growing business on real estate located near the Florida Select plant. Japan Pacific owns the land on which Florida Select and AMC operate.

A few years ago, Sherwood, a British Virgin Islands company, entered into a business arrangement with AMC. Although a dispute exists as to whether Sherwood's initial $1.5 million contribution to AMC was an equity infusion or a loan, no dispute exists that Sherwood since has lent the Corporate Entities substantial additional funds. Tominaga and his late wife, Yoko, guaranteed the repayment of these loans. The exact amount of the outstanding debt due to Sherwood by the Corporate Entities is unliquidated; however, the debt certainly exceeds $2 million and may exceed $10 million. Julian Benscher is a principal of Sherwood and negotiated all terms relating to Sherwood's loans to the Corporate Entities.

The details of the early transactions are fuzzy. However, the parties formalized a lending arrangement by executing various loan documents, on or about April 19, 2001. The loan documents allowed Tominaga to continue running AMC and Florida Select as long as he made current payments on the loans. Further, the loan documents appointed Greenspoon, Marder, Hirschfeld, Rafkin, Ross & Berger, P.A. ("Greenspoon Marder") to hold all of the outstanding shares of stock of the Corporate Entities (the "Corporate Stock") as Escrow Agent pursuant to the terms of an Amended and Consolidated Stock Pledge and Escrow Agreement dated April 19, 2001, by and between Yasuhiko Tominaga, Yoko Tominaga, Japan Pacific, Sherwood, and Greenspoon Marder (the "Escrow Agreement"). (Debtor's Exh. No. 5). Greenspoon Marder held the Corporate Stock under the Escrow Agreement until July 13, 2004.

The debtor, Yasuhiko Tominaga, owns 50% of the outstanding shares of corporate stock of Japan Pacific and AMC. Yoko Tominaga owned the other 50% of the outstanding shares of Japan Pacific and AMC at the time of her death ("Yoko's Shares"). Yoko Tominaga died intestate and without any children. The debtor is likely to be the sole beneficiary of Yoko's estate; however, the estate of Yoko Tominaga currently is involved in an open probate matter pending before the Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida (the "Probate Court"), Case Number 48–2001–CP–002111–0 (the "Probate Estate"). The Probate Court has not taken any action to administer or authorize the release of Yoko's Shares of the Corporate Stock.

Because Yoko Tominaga guaranteed the debt due by the Corporate Entities to Sherwood, she is a co-obligor. Because of the large amount of the debt due to Sherwood, it is likely that all assets gathered in Yoko's estate will be used to pay creditor claims, such as the claim due to Sherwood. It is unknown if any assets ever will transfer to the debtor from the Probate Estate. The debt owed by the Corporate Entities to Sherwood has been in default since at least January 2004. On June 30, 2004, on behalf of Sherwood and others, Benscher wrote to Tominaga and the Corporate Entities, notifying Tominaga of the default by the Corporate Entities of $8,480,000 and requesting that Tominaga provide a "written proposal or plan to rectify the situation." (Debtor's Exh. No. 69). This letter did not make any reference to the turnover of the Corporate Stock or give any response deadline.

The next day, on July 1, 2004, Greenspoon Marder also wrote to Tominaga and the Corporate Entities in its role as coun-

sel to Sherwood formally asserting a default, listed at $10,750,000. Further, Greenspoon Marder informed Tominaga that Sherwood would exercise its rights under the Escrow Agreement to obtain the pledged shares. The pertinent part of the letter reads as follows:

Further, be advised that we have received written instruction from Sherwood Investments to release the "Pledged Shares" as defined in the Stock Pledge Agreement based upon the default by Borrowers under the April 2001 Note as outlined above. This letter shall also serve this firm's five (5) day written notice pursuant to the Stock Pledge Agreement requesting confirmation of such default. In the event we do not receive the outstanding sums or receive written objection from the Borrowers within five (5) business days of the date hereof, we will release the "Pledged Shares" to Sherwood Investments.

(Debtor's Exh. No. 71).

Neither the letter dated June 30, 2004, nor the letter dated July 1, 2004, were sent to any professional involved in the Probate Estate and do not refer to Yoko's Shares. Neither Sherwood nor Greenspoon Marder notified counsel of record of the Probate Estate, Xiao Bing Xu, of the default, requested the release of Yoko's Shares, or took any action in the pending Probate Case. Therefore, proper notice was never given under the Escrow Agreement as to Sherwood's attempt to exercise control over Yoko's Shares.

On July 6, 2004, Tominaga, who was not represented by counsel at that time, sent a letter to Benscher explaining how he intended to repay the debt due to Sherwood over time using revenue from the operating business of AMC and Florida Select. (Debtor's Exh. No. 72). Tominaga does not respond in any way to Greenspoon Marder's letter of July 1, 2004. Nor does the debtor raise any objection to Greenspoon Marder's intention to release the Corporate Stock to Sherwood. As such, Tominaga's letter does not constitute an objection to the release of the Corporate Stock pursuant to the Escrow Agreement. Nor did the debtor object to the release of his stock certificates via any other method.

As such, on or about July 13, 2004, an attorney at Greenspoon Marder personally delivered the Corporate Stock to Benscher, who remains in possession of both the shares owned by the debtor as well as Yoko's Shares. The Court finds that Greenspoon Marder correctly interpreted the provisions of the Escrow Agreement and acted properly in delivering to Benscher the shares owned by Tominaga. The debtor did not timely object to the release of his shares to Benscher and Sherwood. Further, Tominaga has failed to prove that Sherwood or any of its related agents or entities waived the right to exercise their rights under the Escrow Agreement to obtain his shares.

However, Greenspoon Marder acted *improperly* in delivering Yoko's Shares of the Corporate Entities to Benscher/Sherwood. Pursuant to paragraph 12 of the Escrow Agreement, Greenspoon Marder was not authorized to release the Corporate Stock owned by Mrs. Tominaga's estate until proper notice and an opportunity to object was given. Here, Greenspoon Marder gave *no* notice to Yoko Tominaga or her Probate Estate. Therefore, the delivery of 50% of the Corporate Stock was improper.

As an aside, the Court freely acknowledges it has no jurisdiction to interfere with the administration of the Probate Estate or to otherwise direct the release of Yoko's Shares. Issues raised by Greenspoon Marder's improper control of Yoko's Shares are to be resolved by the Probate Court, not this Court.

On July 15, 2004, Sherwood adopted separate resolutions for each of the Corporate Entities pursuant to which Sherwood: (a) terminated Mr. Tominaga as director, president, and treasurer of the Corporate Entities; (b) terminated Ms. Nancy K. Burns as secretary and director of the Corporate Entities; (c) terminated Thomas D. Resler as vice president and a director of Florida Select; (d) appointed Benscher as director, president, and treasurer of each of the Corporate Entities; (e) appointed Mr. George Roat as director and secretary of each of the Corporate Entities; and (f) designated Bencher as registered agent for each of the Corporate Entities (collectively, the "Corporate Resolutions") (Corporate Entities' Exh. Nos. 19, 20 and 21). Although Sherwood's attorneys explored the proper way to legally transfer ownership of the Corporate Stock, they never took any action to formally change the shareholders of record. Therefore, Yoko Tominaga and the debtor continue to be the record owners of the shares of Japan Pacific and AMC.

Since July 15, 2004, and the enactment of the Corporate Resolutions, Sherwood has operated and controlled the Corporate Entities. Specifically, pursuant to paragraph 6 of the Escrow Agreement, which provides that, if the Corporate Entities are in default under their payment obligations to Sherwood, both Tominaga and Yoko's voting rights shall "automatically cease, without notice, unless and until this default is subsequently cured."

The transfer in voting rights and corporate controls from the record shareholders to Sherwood occurs automatically. No notice is required. Upon a default, Sherwood was entitled to immediately vote as they saw fit all pledged shares in Japan Pacific and AMC "regardless whether the shares remain subject to this Agreement or a controversy." No credible question exists that the Corporate Entities had defaulted in their payment obligations to Sherwood by at least January 2004. Therefore, Sherwood had the ability to assume control of the Corporate Entities in early 2004.

However, Sherwood waited, until July 15, 2004, to exercise voting control over the pledged shares. Sherwood's actions in enacting resolutions removing the Corporate Entities' former officers and directors and in inserting officers and directors of Sherwood's choosing was appropriate given that a default clearly existed. Moreover, this transfer of power was proper regardless of any turnover of the physical shares of stock or even in light of this dispute raised by Tominaga. Accordingly, subsequent to July 15, 2004, Sherwood and its officers and directors have properly operated the business of the Corporate Entities through their recently appointed officers and directors.

On July 26, 2004, Tominaga filed a voluntary petition initially seeking relief under Chapter 13 of the Bankruptcy Code in the United States Bankruptcy Court for the Middle District of Florida. A few days later, the Court entered an order converting the debtor's Chapter 13 case to a case seeking reorganization under Chapter 11 of the Bankruptcy Code.[3]

On October 22, 2004, Tominaga filed Adversary Proceeding 6:04–ap–224. Count V of this adversary proceeding seeks virtually the same relief previously sought in the Emergency Motion (Main Case Doc. No. 70). Because of the similarity of the issues raised in the Emergency Motion and

---

**3.** On October 7, 2004, the Corporate Entities filed their own cases under Chapter 11 of the Bankruptcy Code, Case Numbers 6:04–bk– 11049–KSJ (Japan Pacific), 6:04–bk–11050– KSJ (Florida Select), and 6:04–bk–10052–KSJ (American Mercantile).

Count V of the Adversary Proceeding Complaint, the parties presented evidence on these issues at the combined evidentiary hearing held on November 22, 23, and December 6, 2004.

In the Emergency Motion and in Count V, Tominaga essentially asks this Court for two types of turnover. First, Tominaga wants Sherwood/Benscher to return the Corporate Stock to him. Second, and more importantly, Tominaga wants Sherwood, Benscher, and the newly appointed officers and directors to stop acting on behalf of the Corporate Entities. He primarily wants to resume control of the Corporate Entities. Tominaga is not entitled to the relief he seeks.

■ Section 542(a) of the Bankruptcy Code provides:

> (a) ... [A]n entity, ... in possession, custody or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under Section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

11 U.S.C. § 542(a). In order to prevail in a turnover action, the trustee must show:

(1) the property sought to be recovered is property of the estate, and

(2) the trustee is entitled to use, sell or lease the property pursuant to Section 363 of the Bankruptcy Code.

*Makoroff Lawyers Title Insurance Corp. v. Allegheny Graphics, Inc. (In re Allegheny Label, Inc.)*, 128 B.R. 947, 954 (Bankr. W.D.Pa.1991). Whether a particular asset constitutes property of the estate depends upon whether the debtor has a legal or equitable interest in the asset. 11 U.S.C. § 541(a)(1); *Goff v. Taylor (Matter of Goff)*, 706 F.2d 574, 578 (5th Cir.1983). Whether the debtor has a legal or equitable interest in property is determined by state law. *Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979).[4]

Tominaga argues that Florida law[5] prohibits the transfer of voting rights absent the record transfer of the underlying stock interest. Since Tominaga was and remains the record shareholder of the Corporate Stock held and voted by Sherwood, he argues that Sherwood's voting was improper and that he is the only party legally entitled to vote the shares until they are officially transferred out of his name. In *Hickory Point Ind., Inc. v. Hickory Holding Corp., (In re Hickory Point Ind., Inc.)*, 50 B.R. 303 (Bankr.M.D.Fla.1985), the Bankruptcy Court enforced a Florida statute providing that "[a] shareholder whose shares are pledged shall be entitled to vote such shares until the shares have been transferred into the name of the pledgee, and thereafter the pledgee or his nominee shall be entitled to vote the shares so transferred." Fla. Stat. § 607.097(8). However, Florida Statute Section 607.097 was repealed in 1989, and the voting entitlement of shares is now governed by Florida Statute Section 607.0721.

■ Unlike Florida Statute Section 607.097, Florida Statute Section 607.0721 is silent in regards to the voting rights of pledged shares where the pledgee in possession of the shares is not the shareholder of record, i.e., the shares have not been

---

**4.** Although *Butner* was decided under the Bankruptcy Act of 1898, the principles stated therein have been confirmed under the Code. *Barnhill v. Johnson*, 503 U.S. 393, 112 S.Ct. 1386, 1389, 118 L.Ed.2d 39, 46 (1992).

**5.** Paragraph 13e of the Escrow Agreement provides that Florida law controls.

transferred into the pledgee's name. The language of Florida Statute Section 607.097(8) quoted above was deleted in its entirety, and no other provision addressing the voting of pledged shares was included in its place in the substituted statute. This alone is sufficient for the court to conclude that record transfer of pledged shares is no longer a requirement or prerequisite to voting.

That said, although the newly enacted Florida Statute Section 607.0721 does not directly address the voting rights of pledgees, the statute does address the voting entitlement of certain other entities or individuals. For example, shares held by an executor or guardian, and shares held by or under the control of a receiver or an assignee for the benefit of creditors may be voted without the record transfer of the shares. Fla. Stat. §§ 607.0721(6) and (7). Thus, the statute certainly contemplates and permits voting by certain non-record shareholders.

The statute also permits the voting of redeemable shares. Florida Statute Section 607.0721(4) specifically provides that "[r]edeemable shares are not entitled to vote on any matter, and shall not be deemed to be outstanding, after notice of redemption is mailed to the holders thereof and a sum sufficient to redeem such shares has been deposited with a bank, trust company, or other financial institution upon an irrevocable obligation to pay the holders the redemption price upon surrender of the shares." Stated differently, redeemable shares *are* entitled to vote until such time as a notice of redemption is mailed and the amount necessary to do so is deposited or placed in trust.

■ The redemption of shares provided for in Florida Statute Section 607.0721(4) is similar and analogous to the cure provided for in paragraph 6 of the Escrow Agreement, which explicitly provides that Tominaga's voting rights "shall automatically cease, without notice, unless and until this default is subsequently cured." Thus, if Tominaga is somehow able to cure the now substantial default, he regains the Corporate Stock and the right to vote. (Debtor's Exh. No. 5). The statute, like the Escrow Agreement, both contemplate that redeemable shares or, by extension, pledged shares obtained as collateral upon a default can vote before the occurrence of redemption or cure. Accordingly, the right of secured creditors to vote pledged shares, as contemplated in paragraph 6 of the Escrow Agreement, is consistent with the voting rights associated with redeemable shares allowed in Florida Statute Section 607.0721(4).

No Florida case has interpreted the new provisions of Florida Statute 607.021. Nor does the legislative history shed any light on why the Florida legislature repealed the prior statute, Florida Statute 607.0987(8), which expressly prohibited pledgees from voting pledged shares until record ownership transferred. However, the new statute specifically allows voting rights to transfer to parties who are not record shareholders and treats voting rights arising in connection with redeemable shares remarkably similar to voting rights transferred in stock pledge agreements. Therefore, the Court concludes that, by repealing the prior statute and intentionally removing the prior express prohibition against voting pledged shares, the Florida legislature tacitly has allowed contracting parties to agree on when and how voting rights can transfer under stock pledge agreements.

In this case, the voting rights automatically transferred upon the occurrence of a default. The Escrow Agreement executed by the parties is valid and enforceable. Tominaga agreed that, upon a default in the payment obligations of the Corporate

Entities to Sherwood, he would lose the right to control the votes of the pledged shares. A default in this repayment obligation existed as early as January 2004. Based on this default, Sherwood exercised its right to put new officers and directors in place to run the Corporate Entities by enacting the various corporate resolutions on July 15, 2004. Moreover, based upon the default, Sherwood also was entitled to take possession of the pledged shares from the Escrow Agent, which they did on July 13, 2004. Tominaga failed to file any timely objection to the release of the pledged shares to Sherwood. Since these events occurred before Tominaga filed this bankruptcy case, the protection of the automatic stay did not apply.

However, pursuant to paragraph 6 of the Escrow Agreement, Sherwood is entitled to vote the pledged shares only as long as a default exists. If, by some means, Tominaga is able to cure the default, Sherwood's automatic entitlement to control the operations of the Corporate Entities ceases. Sherwood is not the record owner of the Corporate Entities and only has possession of the Corporate Stock. Therefore, the only basis for Sherwood's current control of the Corporate Entities is the right to vote granted in paragraph 6 of the Escrow Agreement. This provision provides that the transfer of voting rights occurs "unless and until this default is subsequently cured." Therefore, a cure of the default would terminate Sherwood's right to vote and to control the Corporate Entities.

Having ruled as such, the Court is not ignoring the substantial size of the existing default or opining on what would be required to cure the default. Cure likely is very difficult under the various loan docu-

ments. However, in the world of legal possibilities, it is conceivable that Tominaga could pull off this miracle and cure the existing default. In this circumstance, Sherwood would have no legal basis to continue its current operation of the Corporate Entities.

■ Moreover, Sherwood's and Benscher's actions were proper under Florida state law and under the terms of the Escrow Agreement. At least as to the debtor's shares in the Corporate Entities, Tominaga has failed to demonstrate any impropriety or any basis why his request for turnover should be granted *at this time*. However, Tominaga does retain some legal and equitable interest in the Corporate Entities. He remains the record shareholder of the Corporate Stock.[6] Sherwood cannot take any action to sell or otherwise transfer ownership of the Corporate Stock without first obtaining permission of this Court.

In conclusion, the Court holds that, at this time, the debtor has failed to demonstrate any basis for turnover of control of the Corporate Entities or the return of his stock. In the future, the Court does not discount the possibility, remote as it may be, that Tominaga could cure the default and resume control of the Corporate Entities. However, as of now, a substantial default exists and Sherwood is properly in possession of the Corporate Stock and in control of the operations of the Corporate Entities.

Accordingly, the Emergency Motion (Doc. No. 70) is denied. Judgment in favor of Sherwood and Benscher and against Tominaga shall be entered on Count V of the Complaint initiating Adversary Proceeding 04–224. Separate orders consis-

---

**6.** Further, as stated earlier, Sherwood never properly obtained possession of Yoko's Shares.

tent with these Findings of Fact and Conclusions of Law shall be entered.